[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The Department of Children and Families (DCF) filed a termination of parental rights petition with respect to Deanna L., a minor child whose date of birth is May 9, 1993. The child's biological mother, Cheryl L., was named as the respondent in this action. The identity of Deanna's biological father is unknown.[1]
Pursuant to the applicable subsections of C.G.S. §17a-112, DCF has alleged three nonconsensual statutory grounds for CT Page 311 termination: abandonment, parental failure to rehabilitate, and no ongoing parent-child relationship. The petitioner has also alleged, with respect to each count, that the reasons for termination existed for not less than one year prior to the commencement of this action, or the date when the petition was last amended. The petition was filed at the Superior Court for Juvenile Matters in Plainville on January 30, 1996. The case was subsequently transferred to this venue for trial. A motion to amend the petition — adding a factual allegation concerning the respondent's incarceration — was granted on November 12, 1996.
PROCEDURAL HISTORY
Deanna came into the petitioner's care on November 15, 1994 when DCF received an ex parte order of temporary custody, and filed a neglect petition in which it was alleged that the child had been abandoned and denied proper care by her mother. Deanna was subsequently committed to DCF as a neglected and uncared for child on February 1, 1995 at a hearing before the Honorable Christine Keller at the Superior Court for Juvenile Matters in Plainville. Cheryl L. did not attend that hearing. Deanna was originally committed to DCF for a period not to exceed 18 months. The commitment was thereafter extended by the court (Brenneman, J.) on June 17, 1996. DCF filed the termination petition on January 30, 1996. Trial in this case began on November 12, 1996 and was thereafter continued on November 13 and November 19, when the matter concluded. The respondent, the minor child and the petitioner were represented throughout the proceeding by their respective counsel.
The petitioner introduced the testimony of the following witnesses at trial:
1. Kathy Dayner, DCF social worker;
2. Rosemary C., the respondent's aunt;
3. Gretchen B., the respondent's sister-in-law;
4. Thomas Clark, adult probation officer.
Cheryl L. testified on her own behalf during the trial, and also called Donald Collins. Counsel for the minor child did not offer any witnesses. CT Page 312
FACTUAL FINDINGS
The court, having carefully considered all of the testimony and evidence adduced at trial, makes the following findings of fact:
DCF took custody of Deanna, who was then approximately 16 months old, pursuant to an administrative hold on November 11, 1994, after receiving a complaint that the respondent left the child with a friend on November 8, 1994 and failed to return. There were allegations at that time that Cheryl L. was abusing crack cocaine. The respondent admitted during her testimony at this trial that she had, in fact, left her child with a friend and failed to return before DCF assumed Deanna's custody. She also admitted that she was using drugs and shoplifting at that time.
Although the respondent was aware of her need for drug treatment, she rebuffed DCF attempts to provide assistance around the time that Deanna went into state custody. An individual treatment plan dated December 11, 1994 indicated that the mother refused to meet with DCF and enter into a service agreement. (Petitioner's Exhibit 4, Page 3).
The evidence established that the respondent has an unfortunate history of cocaine and heroin abuse. This is a longstanding problem for her — dating back at least 14 years. (Testimony of Rosemary C.) At one point, Cheryl L. was treated for an extended period of time at the Hartford Dispensary's Methadone Maintenance Program as the result of her addiction to opiates. (Petitioner's Exhibit 4).
When Deanna was committed to DCF on February 1, 1995, the respondent did not attend the court hearing. Judge Keller ordered that expectations for the mother, in keeping with those recommended by DCF in its social study, would be set when the mother contacted petitioner. The expectations recommended by the petitioner included requirements that the mother refrain from substance abuse, receive drug treatment, and keep DCF advised of her whereabouts.
DCF Social Worker Kathy Dayner testified that the respondent called her prior to the commitment, in December 1994, but would not say where she was living. Cheryl L. called the worker again in February 1995 and indicated that she was incarcerated in the CT Page 313 correctional facility at Niantic. Ms. Dayner learned that the mother was released from custody shortly after this telephone conversation. The worker next heard from Cheryl L. in April 1995. Ms. Dayner had invited the respondent to attend an administrative case review concerning Deanna. The respondent called Ms. Dayner and informed her that she would not be present due to her hospitalization at New Britain General Hospital. The respondent indicated during that conversation that she was being treated for heroin abuse and pneumonia. Ms. Dayner told the mother that unless she started working with DCF towards reunification, the agency would file for termination of parental rights. Cheryl L. spoke with the worker then about having supervised visits with Deanna at the DCF offices. Ms. Dayner instructed the respondent to contact her upon release from the hospital to make arrangements. Despite the opportunity for supervised visits and Ms. Dayner's admonishments about the possibility of termination, the respondent did not telephone the worker after her release from the hospital. Ms. Dayner did not hear from the respondent again until June, 1995.
Thomas Clark, a probation officer with the Adult Probation Department, testified about his contacts with Cheryl L. and her involvement with the criminal justice system during 1995 and 1996. P.O. Clark stated that Cheryl L. was placed on probation and assigned to his case load by the Superior Court GA-15 in New Britain on February 16, 1995. State Police Bureau of Identification records introduced at trial indicated that the respondent was arrested on a charge of assault third degree on January 31, 1995, and convicted for that offense at GA-15 on February 16th. (Petitioner's Exhibit 5). She was sentenced to a suspended sentence of one year on that date, and placed on three year's probation. When Cheryl L. was sentenced, conditions of probation were imposed by the criminal court. Among them were requirements that she pay restitution to her victim, obtain drug treatment, avoid further criminal violations and keep probation authorities advised of her address.
According to P.O. Clark, Cheryl L. failed to abide by the conditions of her probation. He subsequently applied for an arrest warrant charging her with violation of probation. In the warrant application, P.O. Clark alleged that the respondent had failed to report to probation authorities, and keep him advised of her whereabouts. He also alleged that she failed to obtain substance abuse treatment. Cheryl L. was arrested on June 14, 1995 and subsequently incarcerated at the Niantic correctional CT Page 314 facility. On June 27, 1995, the respondent appeared at Superior Court GA-15 in New Britain. The court continued her on probation and released her from custody. P.O. Clark met with the mother on June 27th. At that time, Cheryl L. told him that she had a major drug problem. The probation officer told her that she should get into long-term, in-patient substance abuse treatment as soon as possible. At that time, the mother told the probation officer that she expected to be admitted to a residential drug treatment facility known as Liberation House in early July, 1995. P.O. Clark told Cheryl L. to report again on July 11, 1995. The mother did report on that date, but thereafter failed to report or comply with the conditions of her probation. Mr. Clark once again initiated probation violation proceedings against Cheryl L.
On June 28, 1995 — the day after she was released from custody — the mother met with DCF social worker Kathy Dayner. Although more than six months had transpired since Deanna had been placed in DCF custody, this was the first time that Ms. Dayner met Cheryl L. in person. The respondent admitted during that meeting that she had a substance abuse problem, and that she had last "used" drugs on June 13, 1995. The respondent showed Ms. Dayner a list of residential drug treatment facilities and informed the worker — as she had informed P.O. Clark the day before — that she wanted to enter Liberation House in Stamford. Ms. Dayner told the respondent that it was necessary for her (Cheryl L.) to get the substance treatment she needed. The worker also admonished the respondent to stay in touch with DCF and keep the agency advised of her whereabouts. During the June 28th visit, Cheryl L. yelled at the social worker, and was shaking so hard that she had difficulty remaining in her chair ( Testimony of Kathy Dayner). Based on her observations of the respondent's appearance and behavior on June 28th, Ms. Dayner concluded that it was necessary for Cheryl L. to undergo a substance abuse evaluation before she would be permitted to visit Deanna. The worker communicated this to the mother on June 30th. The respondent replied that she wanted drug treatment, and again mentioned that she was pursuing admission to Liberation House. On July 10, 1995, Cheryl L. telephoned Ms. Dayner again and spoke to her about the potential admission at Liberation House. She indicated that she needed $35 to complete blood tests which the facility required for admission. Ms. Dayner referred the respondent to city welfare for this financial assistance. Cheryl L. indicated that she had undergone an evaluation at Liberation House on July 7th, and expected to be admitted for treatment there in the near future. During this conversation, Ms. Dayner CT Page 315 promised to transport Deanna to Stamford for visits with Cheryl L. if the mother entered residential treatment at Liberation House. Despite her representations to both P.O. Clark and Ms. Dayner, the respondent never entered Liberation House, nor any other residential substance abuse treatment facility. After the July 10, 1995 conversation, DCF had no contact with the mother until October 1995. And, as noted above, the respondent stopped reporting to her probation officer.
Cheryl L. testified at trial that she planned to enter Liberation House and had an intake appointment there. She maintained that her efforts to obtain long-term in patient treatment there were thwarted due to her inability to pay for the treatment. A letter from Jackie Santagata, supervisory nurse at Liberation House, notes in pertinent part:
 ". . . this letter is to confirm that on July 7, 1995, [the respondent] appeared at Liberation Programs, Inc. a substance abuse treatment program. A medical screening was begun, however, I was interrupted by another staff member and the client was advised that she needed to arrange for financial coverage prior to assessment." (Respondent's Exhibit 2).
In addition to claiming that financial considerations prevented her from going to Liberation House, the mother also testified that she thereafter attempted to get drug treatment at a number of other agencies, also without success. The court finds, however, that the respondent's testimony in this regard was lacking in credibility. By her own admission, and by the testimony of both P.O. Clark and Ms. Dayner, the respondent never informed either DCF or the Department of Adult Probation that she was having a funding problem which prevented her admission to Liberation House. The letter from the Liberation House nurse clearly indicates that Cheryl L. knew about the funding issue on July 7th. She telephoned Ms. Dayner on July 10 and reported to the Probation Department on July 11, and did not mention this problem to either agency. Indeed, during her conversation with Ms. Dayner on July 10, the mother spoke of her evaluation at Liberation House and inferred she would be admitted there shortly. Furthermore, in the months that followed, the respondent failed to report to her probation officer, and did not contact DCF again until October 1995. She never asked either the Probation Department or DCF for assistance in securing residential substance abuse treatment. The respondent's actions, and inaction, in this regard clearly controvert her testimony CT Page 316 that she sincerely sought intensive inpatient drug treatment.
During the period between July and October of 1995, the respondent did not visit Deanna, nor did she request visits through DCF. On October 11, 1995, Cheryl L. telephoned DCF and requested to speak to Ms. Dayner, who was not in the office. A DCF supervisor took the respondent's call. This time, Cheryl L. left a telephone number and gave her address as 226 South Main Street in New Britain. Ms. Dayner attempted to return the call, but was not able to reach the respondent. On October 25, the worker sent a letter to the mother:
 "I am writing as I am concerned about our lack of communication since July 10, 1995. At our last contact you had plans to enter a drug treatment program in Stamford and I want to know what happened with that plan. I knew you called here on October 11, 1995 and spoke to my supervisor. I understood from her that you have been living at the above address for the past four months but failed to inform The Department of Children and Families of your address. Please remember to keep us aware of your address at all times. I am asking that you contact me as soon as you get this letter so that we can schedule a time to meet." (Petitioner's Exhibit 8).
The forgoing letter was mailed to the respondent at 226 South Main St. in New Britain, return receipt requested, on October 25, 1995. It was returned to DCF, as unclaimed, on November 12, 1995. (Petitioner's Exhibit 8). An ongoing individual treatment plan prepared by DCF and dated September 11, 1995 also corroborated the fact that mother was resistant to treatment and unwilling to cooperate with DCF:
 "Deanna was committed to DCF 02/95. Mother met with worker once on 6/28/95 and had plans to enter a drug treatment program. At that point she was continuing to live between friends, motel, family. She was also recently released from jail. Mother has not had contact with DCF since that time and it can be assumed that she did not follow through with her plans. She last saw Deanna briefly in 02/95. Worker discussed with mother the possibility of filing TPR if she continued to remain uninvolved with DCF and Deanna. As Deanna is very young with a parent who has failed to work on reunification, CT Page 317 TPR and adoption is an appropriate plan." (Petitioner's Exhibit 4, Ongoing Individual Treatment Plan dated 9/11/95, Page 7).
It was not until November 30, 1995 that Ms. Dayner next spoke to the respondent. When the social worker asked Cheryl L. where she had been, the respondent claimed that she had been living at the South Main Street address, but also admitted that she had been incarcerated again at Niantic. (Testimony of Kathy Dayner). The Conn. State Police record of the respondent's criminal history indicated that Cheryl L. was arrested on one count of criminal impersonation on September 27, 1995. She was subsequently charged with two counts of criminal failure to appear in court with respect to that charge. The dates when she allegedly failed to appear in the criminal court were October 5, 1995 and January 5, 1996. (Petitioner's Exhibit 5).
During her conversation with Ms. Dayner on November 30, 1995, the respondent claimed that she was "clean and serene" and wanted visitation with Deanna. The worker replied that she had not seen the mother since the previous June, and wanted a face-to-face meeting prior to scheduling visits. Cheryl L. agreed to a meeting, but indicated that she would only attend if her attorney could be present. A meeting was scheduled for December 20, 1995, but was canceled due to a snow storm on that date. The meeting was rescheduled for February 1, 1996. On January 29, 1996, the respondent left the social worker a message indicating that she had just been released from jail again, but that she would attend the scheduled meeting. Cheryl L. failed to keep the appointment on February 1, apparently because she was afraid that she would be arrested for probation violation when she went to the DCF office.
Cheryl L. was arrested and incarcerated in mid-February, 1996. She remained imprisoned at the York Correctional Institution and the Niantic Correctional Institution until her release in October, 1996. Shortly after her imprisonment began, the respondent requested visits with Deanna, which DCF provided on a monthly basis. DCF transported the child to prison visits with the mother during March, April, May, July, August and September, 1996. No visit was held during the month of June 1996, because the mother was being held in restricted housing for a disciplinary violation and did not want the child to see her in that status. While at York, Cheryl L. completed a five-hour-long rehabilitation program known as the Tier I Program. (Respondent's CT Page 318 Exhibit C).
Since her release from incarceration in October 1996, the mother has secured employment with a carpet store and has taken up residence with a friend. (Testimony of the respondent and Donald Collins). The mother also requested in late October, 1996 that DCF arrange a substance abuse evaluation for her. The petitioner complied and scheduled an appointment for Cheryl L. with an agency known as ADRC for November 4, 1996. (Petitioner's Exhibit 7). The respondent failed to appear at that evaluation and did not contact DCF beforehand to cancel the appointment, or offer an explanation as to why she would not attend. Ms. Dayner wrote to the respondent and offered another evaluation scheduled for November 11, 1996. The mother did not keep that appointment. Cheryl L. testified at trial that she failed to keep the appointment because she did not trust the petitioner, or the evaluator it selected. Cheryl L. introduced evidence that she secured her own substance abuse evaluation with a New London Agency known as Concern, Inc. (Petitioner's Exhibit F). The court finds that the respondent's explanation lacks credibility. Evidence adduced at trial indicated that the ADRC evaluation would have included an analysis of the respondent's hair for traces of drugs or controlled substances, while the evaluation conducted by Concern, Inc. did not include drug screens, and was based on an interview with the respondent. The court also notes that it was the respondent who asked DCF to schedule the drug evaluation, during a meeting held on October 31, 1996. (Petitioner's Exhibit 7). The court finds that it was the respondent's concern over the drug screen — and not her purported distrust of DCF — which caused Cheryl L. to miss an evaluation which she herself had requested the agency to arrange just four days earlier.
ADJUDICATION (Based on facts as of November 12, 1996)
 1. Failure to Rehabilitate: C.G.S. § 17a-112 (b)(2) defines this ground for termination of parental rights. The statute applies in those cases where:
 "The parents of a child who has been found by the superior court to have been neglected or uncared for have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the ages and needs of the child, they could assume a responsible position in the life of the child." CT Page 319
As employed in the forgoing statute, the term "personal rehabilitation" has been defined in Connecticut case law to mean the restoration of a parent to his or her former useful and constructive role as parent. In re Juvenile Appeal,1 Conn. App. 463, 477, 473 A.2d 795, cert. denied. 193 Conn. 802,474 A.2d 1259 (1984).
Deanna L., now more than three and a half years old, has been in foster care for more than two years. At the time DCF assumed custody of the child in November 1994, Cheryl L. was, by her own admission, abusing drugs and engaging in criminal behavior. Nearly six months later — in April 1995 — the respondent was hospitalized for pneumonia and heroin abuse. In June 1995, Cheryl L. admitted to both the DCF worker and the state probation officer that she had a substance abuse problem and needed in-patient substance abuse therapy. She promised both Ms. Dayner and P.O. Clark that she would enter Liberation House for that treatment. Instead of doing so, she broke off contact with both officials. Despite an awareness of her serious drug problem and her need for therapy, the respondent continued to rebuff treatment and to violate the criminal law. This resulted in a number of incarcerations, including the eight-month period of imprisonment in 1996. While the respondent continued to engage in this on-going pattern of self-destructive behavior, Deanna L. languished in state foster care for nearly two years. By ignoring her own need for rehabilitative assistance, the respondent also ignored the needs and best interests of her daughter.
The respondent argued during trial that the petitioner failed to offer her appropriate rehabilitative assistance. The respondent also contended that since her release from incarceration in October 1996, she has successfully reformed to the point where termination of parental rights is not required. The court is not persuaded by either argument.
The record is clear that Cheryl L. purposely avoided both DCF and her probation officer and failed to heed their admonishments that she obtain drug treatment. It was Cheryl L. who indicated to both DCF and Adult Probation that she wished to enter long-term treatment at Liberation House. After both agencies indicated that this treatment facility was acceptable — and relied on respondent's representations that she would enter there in the near future — Cheryl L. failed to enter as she had promised. Thereafter, the respondent dropped out of sight and never CT Page 320 informed either agency about her purported problems in funding treatment at Liberation House, or in obtaining the help she needed from other substance abuse treatment facilities. There was also credible evidence at trial that Ms. Dayner of DCF informed the mother that she would transport Deanna to Stamford for regular visits at Liberation House if Cheryl L. was admitted as a patient there. To this date, the mother has never received the type of intensive, in-patient therapy which her extensive history of polysubstance abuse and criminal behavior clearly reveals that she needs.
Cheryl L. testified at trial that since her release from prison in October 1996, she has obtained a job, and housing with a friend. She also indicated that she had undergone a substance abuse evaluation, which indicated that she would benefit from out-patient drug treatment. However, the court is not convinced of either the sufficiency, or sincerity, of these efforts by respondent. As noted above, the respondent requested that the petitioner arrange a substance abuse evaluation for her in late October, 1996. DCF complied and scheduled an evaluation for Cheryl L. with ADRC on November 4, 1996. Cheryl L. failed to attend the evaluation — which would have included hair analysis to test for illegal substance use — without explanation or excuse at the time. The court finds that this is another indication of the respondent's unfortunate tendency to avoid and/or manipulate the agencies which have attempted to help her fight her longstanding addiction. Her actions in this regard call into question the veracity of her assertions that she is sincere about treatment and is abstaining from drugs.
Based on all of the forgoing, the court finds that the petitioner has proven by clear and convincing evidence that the respondent has failed to achieve such degree of personal rehabilitation as would reasonably encourage the belief that she could assume a responsible position in the child's-life-within a reasonable period of time. The court also finds that the petitioner has established by clear and convincing evidence that this ground for termination has existed for a period of time not less than one year, and that the petitioner undertook reasonable efforts to reunify Deanna with her biological mother. These included the investigation worker's offer of a service agreement (which respondent refused), DCF's acquiescence with mother's request for treatment at Liberation House, it's offer to transport the child for regular visits there, the social worker's exhortations that mother cooperate with DCF, visit the child CT Page 321 regularly, and receive drug treatment, and the role which DCF played in transporting the minor child to visits with respondent at the correctional facilities. The court also finds that the respondent's actions in avoiding both DCF and her probation officer, and in failing to contact DCF for protracted periods of time, hindered the petitioner in its efforts to reunify the child with the respondent. The respondent can not ignore and avoid the agencies assigned to assist her, and then successfully complain that those organizations denied her meaningful rehabilitative services. In making each of the forgoing findings, the court has given careful consideration to the child's age, the fact that she has spent more than half of her life in foster care, the multiple foster care placements, and the lack of progress by Cheryl L. towards rehabilitation and reunification.
2. No ongoing parent-child relationship: C.G.S. § 17a-112
(b)(4) defines an ongoing parent child relationship as "the relationship which ordinarily develops as a result of a parent having met on a day to day basis me physical, emotional, moral and educational needs of a child."
The ultimate standard to be applied by the courts in TPR cases with respect to this obligation is whether or not the child has any memories or feelings for the parents which are positive in nature. In re Jessica M., 217 Conn. 459, 468-469 (1991). Although it is apparent that Deanna has bonded with her foster parents and refers to them as "mommy" and "daddy" (Testimony of Kathy Dayner), the petitioner did not establish by clear and convincing evidence during trial that the child has no present, positive feelings or memories for her biological parent. Accordingly, that count of the petition is hereby dismissed.
 3. Abandonment: C.G.S. § 17a-112 (b)(1) provides that a child is abandoned if his or her parent has "failed to maintain a reasonable degree of interest concern or responsibility" for a child's welfare. As with other non-consensual statutory grounds for termination of parental rights, the alleged abandonment must have occurred for an extended period of time, not less than one year. C.G.S. § 17a-112.
There was evidence at trial that the respondent's visitation with Deanna was sporadic, particularly during the first year that she was in foster care. However, there was also evidence that the mother was under a court restraining order not to visit the child's caretaker during a portion of that period. The respondent CT Page 322 alleged that this impacted upon her ability to have contact with the child. Also, there was evidence that the respondent requested and received monthly visitation with the child during her incarceration in 1996. Based on the forgoing, the court finds that the petitioner has failed to prove by clear and convincing evidence that Cheryl L. abandoned her daughter for a period of not less than one year. This count of the termination petition is also dismissed.
 DISPOSITION
Having found that the petitioner has proven by clear and convincing evidence one of the grounds alleged for termination, the court now considers the issue of disposition.
Deanna L. has been in foster care placement for more than two years. During that time, she has lived in three separate foster homes. Deanna was originally placed with a maternal uncle and his wife. DCF removed the child from that home in May, 1995, after receiving reports that the uncle had allegedly abused other relatives. (Testimony of Kathy Dayner.)
The child was thereafter placed in a DCF-licensed foster home. She remained there until January 1996, when DCF placed her in the "legal risk" pre-adoption foster home where she currently resides. Deanna refers to her prospective adoptive parents as "mommy" and "daddy". (Testimony of Kathy Dayner.) She calls the respondent "Cheryl". (Testimony of Kathy Dayner).
Ms. Dayner testified that Deanna "has a sense of family" in this foster home, and has developed a "sense of permanency" there. She also expressed the opinion that Deanna is very young, and needs to know where she will grow up.
The DCF social study indicates that the foster parents have "committed themselves to providing permanent placement" for Deanna "with the hope of adopting her should parental rights be terminated by the court." (Petitioner's Exhibit 1, Page 9). It also notes that the child "has done very well in this home and identifies her legal risk parents as "Mommy and Daddy" and that "she refers to them constantly to this worker when she is being transported to and from Niantic for visits with [the respondent]." (Petitioner's Exhibit 1, Pages 9-10).
Deanna has a half-sister, Vikki L., who was born to the CT Page 323 respondent in 1981. Vikki has been raised by Rosemary C., the respondent's aunt. Deanna has been visiting monthly with her half-sister. At this point in time, the visits are more important to 15-year-old Vikki than they are to Deanna. (Petitioner's Exhibit 1, Page 10). However, the DCF social study also indicates:
 "Deanna's lack of response to these visits more than likely is due to her young age and that fact that she never lived with Vikki. Presumably, as she gets older, maintaining a relationship with her sister, Vikki, will be an important part of her life." (Petitioner's Exhibit 1, Page 10).
The evidence and testimony introduced at trial indicates that Deanna L. desperately needs the permanency and stability of a loving home. She has been in three placements, and is only three and a half years of age. During the more than two years that she has been in state care, the respondent has continued to abuse drugs, and violate the criminal law. Despite her recognition that she needed long-term in-patient treatment, the respondent failed to get it. She consistently rebuffed treatment — and two state agencies which attempted to offer her guidance and assistance — while Deanna was relegated to state custody for more than half of her young life.
The court finds that the respondent's chronic drug abuse and criminal misbehavior have consistently prevented her from appropriately parenting either of her two children. Nothing which the court heard at trial offers real promise that his pattern is likely to change. Despite threats of incarceration and termination of her parental rights, Cheryl L. has been unable since 1994 to rehabilitate her situation, and resume custody of Deanna. Although the respondent claims that she has changed since she was released from prison in October 1996, the court finds that it would be adverse to Deanna's best interests to delay permanency planning for the child any further. The child's age, the length of time she has already spent in three different foster homes, her need for a permanent home, the respondent's lack of substantial progress towards reunification during the past two years, and the respondent's consistent unwillingness to cooperate with in-patient substance abuse treatment and the state agencies assigned to assist her, all support this conclusion.
Before the court may enter judgment, it is required by C.G.S. § 17a-112 (d) to make the following written findings: CT Page 324
1. Services offered: The petitioner proved by clear and convincing evidence that, under all the circumstances of this case, DCF offered reasonable and appropriate services to reunify Deanna with her mother. At the time the OTC was granted, the respondent refused to enter into a service agreement with DCF investigation worker, Luis Thuillard. (Petitioner's Exhibit 1, Page 13). The respondent thereafter failed to obtain in-patient substance abuse treatment, or to cooperate with DCF or Adult Probation. The respondent informed DCF that she would enter inpatient substance abuse treatment at Liberation House in July 1995. Social Worker Dayner referred the mother to city welfare for assistance in obtaining the necessary laboratory tests, and offered to transport Deanna to Liberation House for regular visits with the mother once she was admitted there. The respondent failed to enter Liberation House and never requested assistance from DCF in resolving the problems which she claimed prevented her from obtaining drug treatment. Indeed, the respondent thereafter broke off contact with her probation officer and DCF social worker. DCF transported Deanna to monthly visits with Cheryl L. during her eight month period of incarceration in 1996. DCF made two appointments — at respondent's request — for a substance abuse evaluation in November 1996. The respondent failed to keep these appointments.
2. Reasonable efforts to Reunite: Through offers of service, facilitation of visitation, and appropriate exhortation, DCF made reasonable efforts to reunite the respondent with Deanna.
3. Court orders: No court orders were entered in this case. On the date of the child's initial commitment to DCF, Judge Keller ordered that expectations would be set when the respondent contacted petitioner. Cheryl L. failed to attend the February 1, 1995 commitment hearing, and did not meet Ms. Dayner of DCF in person until the following June. During the June meeting, the social worker orally informed the respondent what she would have to do in order to achieve reunification, in accordance with the expectations discussed in court on February 1, 1995.
4. Emotional ties: Deanna has bonded with her current foster parents, with whom she has resided from the past year. She regards them as her mother and father. She knows her biological mother, to whom she refers to as "Cheryl."
5. Age of the child: Deanna is more than three and a half CT Page 325 years of age. Her date of birth is May 9, 1993.
6. Efforts to adjust: As noted at length, herein, the respondent has persistently failed during the past two years to successfully treat her drug problem and to avoid arrests for violation of the criminal law. Her acts of omission and commission in this regard have relegated Deanna to state foster care since November, 1994.
7. Impediments to parent/child relationship: Gretchen B., the respondent's sister-in-law, obtained a restraining order against Cheryl L. after she was allegedly assaulted by the respondent. The respondent claims that this prevented her from visiting Deanna for several months while the child was living with Gretchen B., and her husband. The court notes, however, that the child has not lived in that home since May, 1995. Furthermore, the respondent did not ask DCF, or any court, for assistance in visiting the child. This court has dismissed the counts of the TPR petition which alleged the lack of an ongoing parent-child relationship, and abandonment. The court finds that no unreasonable act or conduct of any agency or individual, and no adverse economic or other circumstance, prevented Cheryl L. from maintaining a meaningful relationship with Deanna.
JUDGMENT AND ORDERS
Having considered the seven factors enumerated above, and having found as proven one of the grounds alleged for termination of parental rights, the court further finds as proven by clear and convincing evidence that it is in the best interests of Deanna L. that Cheryl L.'s parental rights be terminated in order that said child may be freed for adoption.
Accordingly, it is ORDERED that the parental rights of Cheryl L. be, and hereby are, terminated. It is further ordered that the Commissioner of the Department of Children and Families be appointed the statutory parent of said child, for the purpose of securing an adoptive home or other appropriate permanent placement for her. Said Commissioner shall file with this court, no later than 90 days following the date of this judgment, a written report on the progress achieved towards such permanent placement. If adoption has not been finalized by April 1, 1998, then said Commissioner is further ordered to file a Motion for Review of Plan for Terminated Child, which shall be heard by the court no later than July 2, 1998. The court also strongly CT Page 326 recommends that DCF attempt to continue the visits between Deanna and her sibling, Vikki.
Dated at Middletown, Connecticut this 3rd day of January, 1997.
BY THE COURT
DYER, J.